UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

HARVEY HERNANDEZ,

      Debtor.
_____/

BRIARROSE INVEST, LTD.,

      Plaintiff,

v.

HARVEY HERNANDEZ,

      Defendant.
_____/

Case No.: 10-26989-BKC-RAM

Chapter 7

Adversary No._____

## COMPLAINT OBJECTING TO DEBTOR'S DISCHARGE
## AND DISCHARGEABILITY PURSUANT TO 11 U.S.C. §§ 727 AND 523

Plaintiff, Briarrose Invest, Ltd. ("Briarrose"), files this Complaint objecting to Debtor's, Harvey Hernandez, ("Debtor"), discharge pursuant to 11 U.S.C. § 727 and to the dischargeability of Debtor's debt to Briarrose pursuant to 11 U.S.C. § 523, and in support states:

### PARTIES AND JURISDICTION

1.      This Court has jurisdiction of this core proceeding under 28 U.S.C. §§157(b)(2)(I) and (J).

2.      This is an action objecting to the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), 727(a)(3), 727(a)(4)(A), 727(a)(4)(D), and 727(a)(5) and the dischargeability of Debtor's debt to Briarrose pursuant to 11 U.S.C. § 523(a)(2)(B).

3.      On June 16, 2010, Harvey Hernandez (the "Debtor") filed a Voluntary Petition for relief under Chapter 7 of the United States Bankruptcy Code.

4.      Briarrose is a creditor of the Debtor by virtue of a loan extended on January 12, 2006, and a resulting judgment obtained on April 14, 2009 in the principal amount of $1,619,041.10 in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (Case No. 08-46755 CA 27) against the Debtor.

5.      The Court has granted Briarrose several extensions to object to the Debtor's discharge and the dischargeability of Debtor's debt to Briarrose, and ultimately set a deadline of May 25, 2011.

## GENERAL ALLEGATIONS

### Background of the Debtor

6.      The Debtor is an ex-condominium developer who was very successful during the South Florida condominium boom between 2003 through 2006.

7.      H&H Development Co. ("H&H Development") was a wholly owned corporation of the Debtor that the Debtor used to build/convert condominium projects.

8.      In order to build or convert his condominium projects, the Debtor had to borrow funds from lenders – either in his individual name or guaranteed by him.

### Briarrose's Extension of Credit

9.      In 2005, the Debtor approached Briarrose and described a new development which he was working on known as the "Bird Road Project." In connection that that development, the Debtor sought investors and persuaded Briarrose to become an investor in the project by lending the sum of $1 million.

10.     After having reviewed the information provided to Briarrose by the Debtor, including the Debtor's written financial statements, and based on that information, Briarrose lent the $1 million to the development and the Debtor executed and delivered a guaranty for that obligation.

11.     Ultimately, the loan made by Briarrose went into default and, on April 14, 2009, Briarrose obtained a judgment against the Debtor in the principal amount of $1,619,041.10.

**The Debtor Transfers Over One Million Dollars to His Uncle**

12.     On March 16, 2008, the Debtor transferred $320,000 (the "$320K Transfer") from his individual account to his uncle, Manuel Hernandez (the "Debtor's Uncle").

13.     The Debtor's Uncle is a Venezuelan citizen who resides in Venezuela.

14.     On April 10, 2008, the Debtor's wholly-owned development company, H&H Development, transferred $1,100,000 (the "$1.1M Transfer") to the Debtor's Uncle (collectively, the $320K Transfer and the $1.1M Transfer shall be referred to as the "Uncle Transfers").

15.     The Debtor testified at his Rule 2004 Examination that he made the Uncle Transfers to the Debtor's Uncle to repay a loan that the Debtor's Uncle had made to the Debtor so that the Debtor could pay his ex-wife.

16.     The Debtor has never produced any loan documents to the Trustee evidencing any loans made by the Debtor's Uncle to the Debtor.

17.     In addition, the Debtor testified that he used the bank account of H&H Development to pay for his personal expenses.

18.     The Debtor had complete control over the H&H Development bank account in that he had the sole power to designate who would receive funds from that account, as well as the power to actually disburse all the funds within that account.

19.     The Uncle Transfers were deposited into a bank account in the name of the Debtor's Uncle at Eastern National Bank (the "ENB Account"), which was opened on March 12, 2008.

20.     The ENB Account was opened with a $1,000 deposit by the Debtor.  In addition, the Debtor had signature authority and a full power of attorney over the ENB Account.

21.     The Debtor deposited some of his income in 2008 into the ENB Account.

22.     The Debtor did not initially disclose the ENB Account on his bankruptcy schedules, despite the fact that he had a full power of authority over that account, until after the Trustee questioned the Debtor about the ENB Account at the Debtor's Rule 2004 Examination.

**Beaufort Advisors**

23.     On March 12, 2008 (the same date the ENB Account was opened), the Debtor's Uncle incorporated Beaufort Advisors, Ltd. ("Beaufort Advisors") in the British Virgin Islands.

24.     On April 4, 2008, an account at Merrill Lynch in Florida was opened for Beaufort Advisors (the "Merrill Lynch Account").  Once again, the Debtor had a full power of attorney over the Merrill Lynch Account.

25.     On April 9, 2008, the Debtor's Uncle executed a Revocable Trust (the "Trust") Settlement Agreement (the "Trust Agreement").

26.     The Trust Agreement documents were produced by Merrill Lynch and not the Debtor.  The Trust Agreement provides that the Debtor's Uncle is both the settler and trustee.

27.     The Trust Agreement also provides that upon either the death of the Debtor's Uncle or the Debtor, whichever occurs first, that the Trust (after paying all expenses for the Trust) shall set apart and deliver the Trust res to the Harvey Hernandez Declaration of Trust dated April 9, 2008.

28.     The Debtor has not produced, or listed in his bankruptcy schedules, the Harvey Hernandez Declaration of Trust dated April 9, 2008.

29.     Beaufort Advisors listed its business address in the Merrill Lynch Account opening documents at the Debtor's place of business.

30.     Thereafter, $1,100,000 was transferred from the ENB Account to the Merrill

Lynch Account on May 1, 2008; $310,000 was transferred from the ENB Account to the Merrill

Lynch Account on January 12, 2009.

31.     The Debtor did not initially disclose the Merrill Lynch Account on his bankruptcy

schedules, despite the fact that he had a full power of authority over the Merrill Lynch Account.

The Debtor only disclosed the Merrill Lynch Account on his bankruptcy schedules after being

questioned about it at his Rule 2004 examination.

32.     At the Debtor's Rule 2004 Examination, which was taken on November 12, 2010,

and at which time neither Briarrose nor the Trustee had yet received any documents regarding

Beaufort Advisors' Merrill Lynch Account or had knowledge of the Debtor's full power of

attorney and signature authority over the Merrill Lynch Account, the Trustee questioned the

Debtor regarding Beaufort Advisors.  Below are portions of the Debtor's testimony:

    Q:     Do you know whether [Beaufort] is incorporated?
    A:     No idea.
    Q:     Manuel Hernandez owns that company alone?
    A:     No idea.

Hernandez 2004 Transcript at pg. 70:13-17.

    Q:     Does Beaufort Advisors have any bank accounts in the United States of America?
    A:     I'm assuming.
    Q:     Do you know –
    A:     I don't know.
    Q:     --where?
    A:     No I don't know where.

Hernandez 2004 Transcript at pgs. 72:2—73:1.

    Q:     Do you know whether Beaufort Advisors has an account at Merrill Lynch?
    A:     Yes it does.
    Q:     Excuse me?
    A:     I think it does.
    Q:     Does Beaufort have an account at Merrill Lynch?
    A:     I think it does, yes.
    Q:     Do you know if that account is still open?
    A:     I have no idea.

Q:    Once this money went out to Beaufort Advisors, this $1,100,000, did you receive
       any of it from Mr. Hernandez?
A:    No.

Hernandez 2004 Transcript at pg.149:10-23.

33.    On January 19, 2011, the Trustee received documents produced by Merrill Lynch

regarding the Merrill Lynch Account ("ML Documents").

34.    The ML Documents evidence that the Debtor had a full power of attorney over

the Merrill Lynch Account, and more importantly, that the Debtor had control over the funds in

the Merrill Lynch Account.

35.    An example to show that the Debtor had control over the Merrill Lynch Account

is that the Debtor had a Visa check card tied to the Merrill Lynch Account, which Visa check

card the Debtor used between July 10, 2009 through December 31, 2010 (when the funds in the

Merrill Lynch Account were virtually depleted) on every imaginable personal expense – from

consistently dining at expensive restaurants to purchasing luxury goods.

36.    Notably, the Debtor's Uncle did not have a Visa check card tied to the Merrill

Lynch Account.

37.    Despite the Debtor's testimony at his Rule 2004 Examination, he actually used his

Visa check card tied to the Merrill Lynch Account during the month of November 2010 (the

month of his Rule 2004 Examination).

38.    In addition, the Debtor testified that he knew Beaufort Advisors had lent some

monies, but he did not know to whom.

39.    The Debtor testified at his Rule 2004 Examination as follows:

Q:    Okay.  Has Beaufort Advisors ever - - is Beaufort Advisors in the business of
       lending money?
A:    I know that he [Mr. Hernandez] has lent money through Beaufort, but I don't
       know what is the main - -
Q:    Who has he lent money to Beaufort - - who has he lent money to through
       Beaufort?

A:     I don't know.  I mean, I know that he has lent money through Beaufort, but I don't know, I cannot tell you exactly to who.

Hernandez 2004 Transcript at pg. 71:7-15.

40.     The Debtor made misrepresentations or purposely omitted information at his Rule 2004 Examination regarding his knowledge of Beaufort Advisors.

41.     The Debtor controls, and has always controlled, Beaufort Advisors and its Merrill Lynch Account in that he had the power to designate who would receive funds from that account, as well as the power to actually disburse all the funds within that account.

### The Solution Group and Real Estate Advisors

42.     The Solution Group, LLC ("TSG") is allegedly owned by Raul de Varona ("Mr. Varona") and Camilo Lopez ("Mr. Lopez").

43.     TSG is in the business of purchasing and selling distressed properties.  TSG either creates an entity that is capitalized by investor funds and owned by such investors, which in turn purchases distressed properties that TSG consults on and manages; or, it creates an entity that it owns (usually with an investor) in which the investor loans money to that entity to purchase distressed properties.

44.     Since 2009, the Debtor, through Real Estate Advisors, Inc. ("Real Estate Advisors") has allegedly been a consultant for TSG.  As payment for his consulting services, TSG pays the Debtor a salary and his health insurance, although it is not actually known how much the Debtor is paid and what benefits the Debtor receives.

45.     Real Estate Advisors is the Debtor's wholly-owned company which was incorporated on January 16, 2009, and from which date he has paid a majority, if not all, of his personal expenses.  The Debtor did not disclose Real Estate Advisors in his bankruptcy schedules.

46.     Between January 2010 and August 2010, TSG ran its payroll for its employees through Real Estate Advisors.  In other words, TSG would deposit monies into Real Estate Advisor's bank account which monies would then be used to pay TSG's employees.

47.     In addition, TSG held the Debtor out as its "Chairman of the Board" on its website until the Trustee questioned the Debtor about his involvement in TSG, after which TSG's website was changed.[1]

### MH Real Estate Holdings

48.     MH Real Estate Holdings, LLC ("MH Real Estate Holdings") is a company allegedly owned by Mr. Lopez and managed by TSG.

49.     On September 1, 2009, Beaufort Advisors allegedly made a loan to MH Real Estate Holdings in the amount of $1,750,000 (the "Loan").

50.     At the time of the Loan, the Loan was the biggest investment/loan TSG or Mr. Lopez had received in furtherance of TSG's business.

51.     The Loan is evidenced by a promissory note (the "Note").

52.     The Note was produced by TSG months after the Rule 2004 examinations of the Debtor and Mr. Varona, and immediately before the Rule 2004 Examination of Mr. Lopez on February 23, 2011.

53.     Mr. Lopez, the alleged signatory on the Note, testified he did not recall seeing or signing the Note, but yet knows that he "probably" did sign the Note.

54.     To date, Beaufort Advisors has transferred $1,753,894 from its Merrill Lynch Account to MH Real Estate Holdings.

---

[1] Mr. Varona testified at his Rule 2004 Examination that the Debtor was not involved in any official capacity with TSG, and was merely a "consultant."

55.     The alleged purpose of the Loan from Beaufort to MH Real Estate Holdings was so that MH Real Estate Holdings could purchase distressed properties in Miami-Dade and Broward counties.

56.     In fact, since September 2009, MH Real Estate Holdings has purchased over 40 properties in Miami-Dade and Broward counties (the "MH Properties").

57.     MH Real Estate Holdings has sold some of the MH Properties, still owns some of the MH Properties (some of which it is collecting rent from), and has transferred some of the MH Properties to affiliated entities such as MH Real Estate Holdings Group I, LLC ("MH Real Estate Holdings Group I"), MH Real Estate Holdings Group II, LLC ("MH Real Estate Holdings Group II"), and MH Real Estate Holdings Group III, LLC ("MH Real Estate Holdings Group III"), as well as TB Equity Holdings, LLC ("TB Equity").

58.     The Debtor manages the affairs of MH Real Estate Holdings, has held himself out to the public as the managing director of MH Real Estate Holdings, has the power to designate who gets paid from funds belonging to MH Real Estate Holdings, and according to Mr. Lopez, is the person that approves which properties MH Real Estate Holdings is going to purchase with Beaufort funds.

59.     In effect, the Debtor controls MH Real Estate Holdings.

60.     Despite such evidence, the Debtor testified as follows at his Rule 2004 Examination:

Q:      Okay.  Have you heard of a company called MH Real Estate Holdings, LLC?
A:      Yes.
Q:      What company is that?
A:      It's a real estate company.  I mean, it's an investment company.
Q:      And who owns that?
A:      I believe it's Camilo Lopez.
Q:      Is there any – is it a coincidence that MH Real Estate Holdings, LLC, bears the initials of Manuel Hernandez?
A:      No, Manuel is a big investor in MH.
Q:      So, he is a big investor in MH Real Estate Holdings, LLC?

A: Yes, but I don't think he owns the company though.
Q: Okay, then why is Manuel a big investor in MH Real Estate Holdings, LLC?
A: Why?
Q: Why?
A: I don't know why. I mean - -
Q: So you don't know anything about that?
A: - - because he decided to be a big investor, I mean - -
Q: Well, I mean - -
A: he invested in that company, which buys and sells property.
Q: The reason I ask you is you said you were very close with him, he's like a father to you. So, I'm assuming that when he would become a big investor in any company, you guys would have a discussion about it. Wanted to know why he decided to become an investor in MH Real Estate - -
A: No, no, you said why he was a big investor. He's a big investor because he decided to be a big investor. He thought the business was good.
Q: What's the business of MH Real Estate Holdings - -
A: Buy and sell - -
Q: LLC?
A: - - property. I'm sorry, I didn't let you finish.
Q: That's fair enough.
A: I'm sorry.
Q: How many properties does MH Real Estate Holdings, LLC own?
A: I have no idea.
Q: Okay. Did Manuel Hernandez, did he invest money in MH Real Estate Holdings, or did he lend money to MH Real Estate Holdings?
A: I don't know the capacity, if it's investment or a loan.

Hernandez 2004 Transcript at pgs. 75:16 – 77:17.

61. In addition, Mr. Lopez testified as follows:

Q: Let's use an example. Let's say you find a property at a foreclosure sale for $50,000, and you say, I think this is a good property for MH Real Estate, right? Are you with me so far?
A: Yes.
Q: You call up someone and say we want to transfer over $50,000 into MH Real Estate account to buy this property at a foreclosure sale, is that right?
A: No.
Q: Somebody has to give you authority, though, correct, to release the money?
A: Like draws.
Q: Exactly.
A: Yeah.
Q: How do you get authority to make that draw?
A: It was pretty much through Harvey.

Lopez 2004 Transcript at pgs. 139:16 – 140:9.

62.    When questioned about what the Debtor's Uncle did with the Uncle Transfers, the

Debtor testified he did not know.    Specifically, the Debtor testified at his Rule 2004

Examination:

> Q:    Okay, and by the way, I skipped over it, but I'll represent that he had transferred - - "he" being Manuel Hernandez, the $320,000 also to Beaufort Advisors sometime after the transfer of the million one - - one hundred thousand dollars - - well, I know he did.  My question to you is: When he transferred all this money to Beaufort Advisors, what did he do with it all?
> A:    I don't know.
> Q:    You don't know, okay, but it didn't come to you?
> A:    No.
> Q:    You did not see any of it?
> A:    No.

Hernandez 2004 Transcript at pgs. 155:14 – 156:1.

63.    Indubitably, the Debtor has been untruthful about his involvement with TSG,

Beaufort Advisors, and MH Real Estate Holdings, and failed to disclose requisite information

regarding those entities in his bankruptcy schedules.

## REF Broward

64.    REF Broward, LLC ("REF Broward") is allegedly owned by Mr. Lopez and New

Line Investments, LLC, which in turn is owned by Jose Boschetti ("Mr. Boschetti").

65.    Mr. Boschetti is a personal friend of the Debtor and an ex-business partner.

66.    On February 25, 2010, the Debtor transferred $125,000 from the Real Estate

Advisors bank account to REF Broward (the "REF Transfer").

67.    The Debtor testified that he transferred the $125,000 from his Real Estate

Advisors bank account to REF Broward because he owed Mr. Boschetti $195,000 from a

previous real estate deal he had with Mr. Boschetti.

68.    With the $125,000, Mr. Boschetti capitalized REF Broward, which in turn

purchased numerous distressed properties.

69.    In addition, Beaufort Advisors transferred via an alleged loan an additional $120,000 to REF Broward (the "REF Loan"). However, no such loan documentation has been produced by REF Broward or TSG.

70.    REF Broward was, and still is, allegedly managed by TSG.

71.    In effect, the Debtor controls REF Broward.

72.    To date, REF Broward owns numerous properties in Miami-Dade and Broward counties (the "REF Properties").

73.    The Debtor did not disclose REF Broward in his bankruptcy schedules.

### TB Equity Holdings

74.    Upon information and belief, TB Equity Holdings, LLC ("TB Equity Holdings") is owned by Kenneth Baboun and Mr. Lopez.

75.    Kenneth Baboun is a friend of the Debtor's that was recruited by the Debtor to invest into one of TSG's structures. The structure in particular was TB Equity Holdings.

76.    Beaufort Advisors transferred $32,000 to TB Equity Holdings, allegedly as a loan (the "TB Loan").

77.    MH Real Estate Holdings, for reasons unknown, transferred $115,645, to TB Equity Holdings, as well.

78.    TB Equity Holdings used the funds received from Beaufort Advisors and MH Real Estate Holdings to purchase distressed properties in Miami-Dade and Broward counties (the "TB Properties").

79.    In effect, the Debtor controls TB Equity Holdings.

80.    The Debtor did not disclose REF Broward in his bankruptcy schedules.

**Transfers of Properties**

81.     Since the purchase of the MH Properties and the REF Properties, MH Real Estate Holdings and REF Broward have sold and transferred numerous properties.   Many of the transfers were for no or nominal consideration.

82.     By way of example, between May 5, 2010, and September 11, 2010, MH Real Estate Holdings transferred eleven (11) properties to CAZA Investments, LLC, via quit claim deed for $100.

83.     By way of example, REF Broward has sold no less than sixteen (16) properties since February 2010.

84.     In addition, there are numerous transfers of properties between MH Real Estate Holdings, MH Real Estate Holdings Group I, MH Real Estate Holdings Group II, MH Real Estate Holdings Group III, REF Broward, and TB Equity Holdings.

85.     All conditions precedent to the filing of this complaint have been performed, satisfied, or waived.

**COUNT I**
**Objection to Debtors' Discharge**
**[11 U.S.C. § 727(a)(2)(A)]**

86.     Briarrose realleges paragraphs 1 through 85 above.

87.     Pursuant to 11 U.S.C. § 727(a)(2)(A), the Court shall grant the debtor a discharge, unless the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the debtor, within one year before the date of the filing of the petition.

88.     The Debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, namely the Trustee, has transferred,

removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the Debtor, within one year before the Petition Date, as follows:

    a.  The Debtor concealed the ENB Account;

    b.  The Debtor concealed the Harvey Hernandez Declarations of Trust dated April 9, 2008;

    c.   The Debtor concealed Beaufort Advisors and the Merrill Lynch Account;

    d.  The Debtor concealed the Solution Group;

    e.  The Debtor concealed Real Estate Advisors and its bank account, which he has used to pay his extravagant living expenses;

    f.  The Debtor concealed MH Real Estate Holdings, MH Real Estate Holdings Group I, MH Real Estate Holdings Group II, and MH Real Estate Holdings Group III;

    g.  The Debtor concealed REF Broward;; and

    h.  The Debtor concealed TB Equity Holdings.

89.    Accordingly, the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(2)(A).

**WHEREFORE**, Briarrose requests that the Court enter a judgment against the Debtor granting Briarrose's objection to his discharge pursuant to 11 U.S.C. § 727(a)(2)(A) of the Bankruptcy Code, awarding damages, post-judgment interest, attorneys' fees and costs to Briarrose, and granting any other relief that this Court deems just and proper.

**COUNT II**
**Objection to Debtors' Discharge**
**[11 U.S.C. § 727(a)(3)]**

90.    Briarrose realleges paragraphs 1 through 85 above.

91.     Pursuant to 11 U.S.C. § 727(a)(3), the Court shall grant the debtor a discharge, unless the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

92.     The Debtor has concealed, destroyed, mutilated, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the his financial condition or business transactions might be ascertained, and has not shown that such act(s) or failure to act was justified under all of the circumstances of this case.

93.     The Debtor concealed, or failed to keep or preserve information with respect to his financial condition or business transactions, including documents that satisfactorily explain, reconcile or excuse the above-mentioned allegations.

94.     The Debtor also concealed, or failed to keep or preserve, documents requested by Trustee numerous times pursuant to Federal Rule of Bankruptcy Procedure 2004 and at the 2004 examination of Debtor with respect to his financial condition or business transactions.

95.     Accordingly, the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(3).

WHEREFORE, Briarrose requests that the Court enter a judgment against the Debtor granting Briarrose's objection to his discharge pursuant to 11 U.S.C. § 727(a)(3) of the Bankruptcy Code, awarding damages, post-judgment interest, attorneys' fees and costs to Briarrose, and granting any other relief that this Court deems just and proper.

## COUNT III
### Objection to Debtors' Discharge
### [11 U.S.C. § 727(a)(4)(A)]

96.     Briarrose realleges paragraphs 1 through 85 above.

15

97.    Pursuant to 11 U.S.C. § 727(a)(4)(A), the Court shall grant the debtor a discharge, unless the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account.

98.    The Debtor knowingly and fraudulently, in or in connection with the case, made false oaths or accounts with respect to:

a.  the Debtor's earnings

b.  the ENB Account;

c.  Beaufort Advisors and the Merrill Lynch account;

d.  the Real Estate Advisors;

e.  The Solution Group;

f.  MH Real Estate Holdings, MH Real Estate Holdings Group I, MH Real Estate Holdings Group II, and MH Real Estate Holdings Group III;

g.  REF Broward;; and

h.  TB Equity Holdings.

**WHEREFORE**, Briarrose requests that the Court enter a judgment against the Debtor granting Briarrose's objection to his discharge pursuant to 11 U.S.C. § 727(a)(4)(A) of the Bankruptcy Code, awarding damages, post-judgment interest, attorneys' fees and costs to Briarrose, and granting any other relief that this Court deems just and proper.

## COUNT IV
### Objection to Debtors' Discharge
### [11 U.S.C. § 727(a)(4)(D)]

99.    Briarrose realleges paragraphs 1 through 85 above.

100.    Pursuant to 11 U.S.C. § 727(a)(4)(D), the Court shall grant the debtor a discharge, unless the debtor knowingly and fraudulently, in or in connection with the case withheld from an

officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

101.   The Debtor knowingly and fraudulently, in or in connection with the case withheld from an officer of the estate, namely the Trustee, entitled to possession under this title, recorded information, including books, documents, records, and papers, relating to the Debtor's property or financial affairs, including information and documents requested by Trustee numerous times pursuant to Federal Rule of Bankruptcy Procedure 2004 and at the 2004 examination of Debtors with respect to their financial condition or business transactions. and other documents relating to his  financial affairs or that satisfactorily explain, reconcile or excuse the above-mentioned allegations.

102.   Accordingly, the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4)(D).

**WHEREFORE**, Briarrose requests that the Court enter a judgment against the Debtor granting Briarrose's objection to his discharge pursuant to 11 U.S.C. § 727(a)(4)(D) of the Bankruptcy Code, awarding damages, post-judgment interest, attorneys' fees and costs to Briarrose, and granting any other relief that this Court deems just and proper.

**COUNT V**
**Objection to Debtor's Discharge**
**[11 U.S.C. § 727(a)(5)]**

103.   Briarrose realleges paragraphs 1 through 85 above.

104.   Pursuant to 11 U.S.C. § 727(a)(5), the Court shall grant the debtor a discharge, unless the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

105.   The Debtor failed to explain satisfactorily his loss of assets or deficiency of assets to meet their liabilities.

106.    Debtor was untruthful about his affairs as described above, and concealed significant assets.

107.    Moreover, in conjunction with the Debtor's Uncle, Mr. Varona and Mr. Lopez, the Debtor made arrangements to hide and have hidden assets, including bank accounts and real estate, that he used or uses to pay for living expenses.

108.    Accordingly, the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(5).

**WHEREFORE**, Briarrose requests that the Court enter a judgment against the Debtor granting Briarrose's objection to his discharge pursuant to 11 U.S.C. § 727(a)(5) of the Bankruptcy Code, awarding damages, post-judgment interest, attorneys' fees and costs to Briarrose, and granting any other relief that this Court deems just and proper.

### COUNT VI
### Objection to Dischargeability of Debt to Briarrose
### [11 U.S.C. § 523(a)(2)(B)]

109.    Briarrose realleges paragraphs 1 through 85 above.

110.    Pursuant to 11 U.S.C. § 523(a)(2)(B), a discharge under section 727 does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by use of a statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

111.    The Debtor submitted to Briarrose written financial statements concerning his financial condition which were materially false.

112.    The Debtor published those financial statements to Briarrose with the intent to deceive.

113.     Briarrose reasonably relied on the false financial statement in connection with its extension of credit to the Debtor.

114.     Accordingly, the Debtor's debt to Briarrose should not be discharged pursuant to 11 U.S.C. § 523(a)(2)(B).

**WHEREFORE**, Briarrose requests that the Court enter a judgment against the Debtor granting Briarrose's objection to the dischargeability of his debt to Briarrose pursuant to 11 U.S.C. § 523(a)(2)(B) of the Bankruptcy Code, awarding damages, post-judgment interest, attorneys' fees and costs to Briarrose, and granting any other relief that this Court deems just and proper.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic mail upon each of the parties and counsel identified on the CM/ECF service list and maintained by the Court for this case on May 25, 2011.

Respectfully submitted,
**GRAYROBINSON, P.A.**
*Attorneys for* Briarrose Invest, Ltd.
1221 Brickell Avenue, Suite 1600
Miami, FL 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

By: /s/ Ileana E. Christianson
        Juan C. Martinez
        Florida Bar No.: 009024
        Ileana E. Christianson
        Florida Bar No. 673366